Filed 12/19/17 On rehearing

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| CITY OF ANAHEIM et al., | C081918 |
| Plaintiffs and Appellants, | (Super. Ct. No. 34201380001529CUWMGDS) |
| v. | |
| MICHAEL COHEN, as Director, etc. et al., | OPINION ON REHEARING |
| Defendants and Respondents, | |

APPEAL from a judgment of the Superior Court of Sacramento County, Michael P. Kenny, Judge. Reversed.

Rutan & Tucker, Jeffrey M. Oderman for Plaintiffs and Appellants.

Kamala D. Harris and Xavier Becerra, Attorneys General, Douglas J. Woods, Senior Assistant Attorney General, Constance L. LeLouis and Anthony P. O'Brien, Deputy Attorneys General, for Defendants and Respondents.

In this redevelopment case, the city of Anaheim, acting in its capacity as successor to the former Anaheim Redevelopment Agency, sought approval from the California Department of Finance (the department) to obtain money from the Redevelopment Property Tax Trust Fund (the fund or, sometimes, the RPTTF) to pay back the city of Anaheim for payments the City of Anaheim made to a construction company to complete certain real property improvements that the former Anaheim Redevelopment Agency was obligated to provide on a particular redevelopment project (the packing district project).[1] The city and the city as successor characterized the transaction between themselves as a loan, but the department ultimately denied the claim for money from the fund because the city did not disburse the loan proceeds to the city as successor, but instead paid the construction company directly, and because the city as successor did not obtain prior approval for the "loan" agreement with the city from the oversight board.

Around the same time, the city as successor sought approval from the department to obtain money from the fund to make payments to the Anaheim Housing Authority (the authority) under a cooperation agreement between the agency and the authority, the purpose of which was to provide funding for the Avon/Dakota revitalization project, which was being carried out by a private developer -- The Related Companies of California, LLC (Related) -- pursuant to a contract with the authority. The department denied that claim because the 2011 law that dissolved the former redevelopment agencies renders agreements between a former redevelopment agency and the city that created that agency (or, as relevant here, a closely affiliated entity like the authority) unenforceable.[2]

---

[1]  We will refer to the former Anaheim Redevelopment Agency as the agency. We will refer to the City of Anaheim acting in its capacity as successor to the agency as the city as successor and otherwise as the city.

[2]  We will sometimes refer to the body of laws governing the dissolution of redevelopment agencies as the dissolution law.

The city, the city as successor, and the authority sought mandamus, declaratory, and injunctive relief on both issues in the superior court, but the trial court denied the writ petition and dismissed the complaint for declaratory and injunctive relief.[3]

On plaintiffs' appeal, we conclude the trial court erred. As we will explain, with respect to the packing district project, the fact that the city contracted directly with the construction company to construct the improvements the agency was legally obligated to provide at that project, and the fact that the city paid the company directly for its work, did not mean the agreement between the city and the city as successor with respect to the transaction was not a loan, as the department and the trial court concluded. Also, the fact that the city as successor did not obtain prior approval from the oversight board to enter into a loan agreement with the city did not give the department a valid reason to deny the city as successor's request for money from the fund to pay off the loan.

As for the money from the fund claimed for the Avon/Dakota revitalization project, we conclude that enforcing the provision of the dissolution law that renders unenforceable an agreement between a former redevelopment agency and the city that created it (or an affiliated entity like the authority) would, in this case, unconstitutionally impair Related's contractual rights under its agreement with the authority. Accordingly, that provision cannot be enforced here to deny the city as successor the right to obtain money from the fund to pay the authority that, in turn, the authority is obligated to pay Related to carry out the revitalization project.

Accordingly, we will reverse.

_____

**3**     For ease of reference, we will refer to these three parties, along with Related, who was named as a real party in interest in the trial court, jointly as plaintiffs, because all four parties are participating as appellants in this appeal and thus share a common interest in the case.

3

LEGAL BACKGROUND

Before June 2011, the Community Redevelopment Law (Health & Saf. Code,[4] § 33000 et seq.) authorized cities and counties to establish redevelopment agencies to remediate urban decay and revitalize blighted communities. (*California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 245-246 (*Matosantos*).) To finance their activities, redevelopment agencies relied on "tax increment financing . . . . [Citations.] Under this method, those public entities entitled to receive property tax revenue in a redevelopment project area (the cities, counties, special districts, and school districts containing territory in the area) [we]re allocated a portion based on the assessed value of the property prior to the effective date of the redevelopment plan. Any tax revenue in excess of that amount -- the tax increment created by the increased value of project area property -- [went] to the redevelopment agency for repayment of debt incurred to finance the project. [Citations.] In essence, property tax revenues for entities other than the redevelopment agency [we]re frozen, while revenue from any increase in value [wa]s awarded to the redevelopment agency on the theory that the increase [wa]s the result of redevelopment." (*Id.* at pp. 246-247.)

In June 2011, as a partial means of closing the state's projected budget deficit, the Legislature passed, and the Governor signed, Assembly Bill XI 26, which, in addition to other things, "dissolve[d] all redevelopment agencies [citation] and transfer[red] control of redevelopment agency assets to successor agencies, which are contemplated to be the city or county that created the redevelopment agency." (*Matosantos*, *supra*, 53 Cal.4th at p. 251.) A successor agency is required to "[c]ontinue to make payments due for enforceable obligations" (§ 34177, subd. (a)), which include "[a]ny legally binding and enforceable agreement or contract that is not otherwise void as violating the debt limit or

---

[4]     All further section references are to the Health and Safety Code.

4

public policy" (§ 34171, subd. (d)(1)(E)), but which do *not* include "any agreements, contracts, or arrangements between the city, county, or city and county that created the redevelopment agency and the former redevelopment agency" (*ibid.*, subd. (d)(2)).[5]

To obtain funds to make payments required by enforceable obligations, a successor agency must prepare, and submit to the department for approval, a recognized obligation payment schedule (ROP schedule) for every six-month fiscal period from January 1, 2012 through June 30, 2016 (§§ 34171, subd. (h), 34177, subds. (a)(1), (l) & (m)) and thereafter for every fiscal year (§ 34177, subd. (o).) An ROP schedule "set[s] forth the minimum payment amounts and due dates of payments required by enforceable obligations for each six-month fiscal period." (§ 34171, subd. (h).) For each recognized obligation, the schedule must "identify one or more . . . sources of payment." (§ 34177, subd. (l)(1).) Among the possible sources of payment is the fund (*id.*, subd. (l)(1)(E)), into which the county auditor-controller is charged with depositing tax increment funding, i.e., "the amount of property taxes that would have been allocated to each redevelopment agency in the county had the redevelopment agency not been dissolved." (§ 34182, subd. (c)(1).)

The successor agency's oversight board must approve each ROP schedule. (§ 34180, subd. (g).) Following the oversight board's approval, the agency must submit the ROP schedule to the department for its approval. (§ 34177, subd. (m)(1).) The department then determines "the enforceable obligations and the amounts and funding sources of the enforceable obligations." (*Ibid.*)

---

**5**    A related provision of the dissolution law provides that "[c]ommencing on the operative date of this part, agreements, contracts, or arrangements between the city or county, or city and county that created the redevelopment agency and the redevelopment agency are invalid and shall not be binding on the successor agency." (§ 34178, subd. (a).)

In 2012, the dissolution law was amended to provide a mechanism by which the municipality that created a redevelopment agency could lend money to the successor agency to make payments due on enforceable obligations. Specifically, former subdivision (h) was added to section 34173, and at the time relevant here that subdivision provided as follows: "The city, county, or city and county that authorized the creation of a redevelopment agency may loan or grant funds to a successor agency for administrative costs, enforceable obligations, or project-related expenses at the city's discretion, but the receipt and use of these funds shall be reflected on the Recognized Obligation Payment Schedule or the administrative budget and therefore are subject to the oversight and approval of the oversight board. An enforceable obligation shall be deemed to be created for the repayment of those loans."[6] (Stats. 2012, ch. 26, § 7.)

With this legal background in mind, we turn to the facts of this case.

## FACTUAL AND PROCEDURAL BACKGROUND

### A

### *The Parking And Alley Improvements At The Packing District Project*

On October 26, 2010, the agency and LAB Holding LLC (LAB) entered into an agreement for the redevelopment of several agency-owned properties in the city's "Packing District" (the LAB agreement). Among other things, the LAB agreement obligated the agency to construct a surface parking lot and interior alley improvements to serve the project (the parking and alley improvements).

In August 2012, the packing district project was nearing completion, but the city as successor had not yet entered into a construction contract for the parking and alley

---

[6] Subdivision (h) of section 34173 was later amended again in 2015 (Stats. 2015, ch. 325, § 3), after this action was commenced, and the department concedes the amended statute does not apply in this case. Accordingly, our analysis in this opinion is limited to the former version of that statute.

improvements it was obligated to provide under the LAB agreement. In the ROP schedule the city as successor prepared that month for the January 2013 through June 2013 fiscal period, the city as successor applied for a distribution from the fund of a sum needed to complete construction of the parking and alley improvements.

Despite having previously approved distributions from the fund of other amounts necessary for the city as successor to perform the agency's obligations under the LAB agreement, and despite continuing to approve other such distributions going forward, the department denied the requested distribution for the parking and alley improvements on the ground the money sought was not for an enforceable obligation. The city as successor submitted a meet and confer request to the department to challenge that determination, and the department issued a revised ruling on the matter in December 2012 denying the requested distribution because "no contracts [we]re in place for the construction."

Because the parking and alley improvements needed to be made quickly, and the city as successor could not wait for the next round of funding under the ROP system (which would not occur until July 2013), the city as successor sought another source of funding to complete the improvements. In February 2013, the city as successor entered into an agreement with the city entitled "COOPERATION AGREEMENT [¶] (Loan Agreement pursuant to Health & Safety Code Section 34173(h))" (bolding omitted) (the loan agreement). The loan agreement recited the pertinent factual background, up to and including the department's denial of the requested distribution from the fund, and noted that the department's denial "presente[d] a logistical challenge for [the city as successor], by requiring the [city as successor] to enter into a construction contract without prior authorization from the [department] to make the payments required by such contract." The loan agreement then noted that former subdivision (h) of section 34173 authorized the city to loan funds to the city as successor for an enforceable obligation and recited that the city desired "to assist the [city as successor] by providing a loan to the [city as

7

successor] . . . to enable the [city as successor] to enable the [city as successor] to enter into [a contract for construction of the parking and alley improvements] at this time and to pay for the construction of [those i]mprovements, all as required by the LAB [agreement]." The loan agreement went on to recite that "[c]oncurrently with this Agreement, the [city as successor] and the City desire to enter into a construction contract with Spiess Construction Co. Inc. . . . for the Parking and Alley Improvements" and that "the total potential expenditure authorized for" those improvements was $1,111,102.20.[7]

The loan agreement then provided that the city would loan to the city as successor, and the city as successor would borrow from the city, up to $1,111,102.20, and the agreement provided that the city would "disburse proceeds of the [loan] to [the city as successor] or directly to [Spiess Construction], as elected by the City, for work performed by [Spiess Construction] under the [construction c]ontract, all in accordance with the requirements of the" contract. The loan agreement also provided that the city as successor would repay the loan upon receipt of money from the fund.[8]

Later that month, the city entered into the contract with Spiess Construction (Spiess) for the construction of the parking and alley improvements.

---

[7] This amount consisted of the price of the contract with Spiess Construction ($925,918.50), plus 20 percent of that contract price for potential change orders.

[8] "3. **Repayment of City Loan**. Successor Agency shall repay the City Loan to City promptly upon receipt of RPTTF moneys for the ROPS 13-14A period, and for and during each subsequent ROPS periods, if necessary, to repay the City Loan in full; provided however, that this Agreement and the Parking and Alley Construction Contract shall have been approved by the DOF as enforceable obligations on ROPS 13-14A (and each subsequent ROPS, as applicable). Subject to Section 4 below, Successor Agency shall repay the entire outstanding principal balance of the City Loan to the City on or before five (5) working days following the date the Successor Agency receives a disbursement of RPTTF moneys for the ROPS 13-14A period (and/or subsequent ROPS periods, as necessary); provided that the Parking and Alley Construction Contract is an approved enforceable obligation on ROPS 13-14A."

In the ROP schedule the city as successor prepared that same month (February 2013) for the July 2013 through December 2013 fiscal period, the city as successor requested a distribution from the fund in the sum of $1,111,102.20 -- the total potential amount of the loan provided for in the loan agreement. In April 2013, the department denied the request because "the loan was entered into for an item denied by [the department] during a prior ROPS period. Therefore, this item is not an enforceable obligation . . . ." Following the meet and confer process, the department issued a new denial letter in May 2013, denying the request because the city as successor was not a party to the construction contract between the city and Spiess.

In June 2013, the city and the city as successor commenced the present action by filing a petition for writ of mandate and complaint for declaratory and injunctive relief in the Sacramento County Superior Court. With respect to the parking and alley improvements, plaintiffs sought a writ compelling the department to set aside its previous actions and determinations and to "issue a formal written determination and directive that . . . the LAB [agreement] and [Cooperation] Agreement are enforceable obligations . . . eligible for payment from the . . . [f]und" and that the city as successor is "entitled to an allocation of moneys from the . . . [f]und in conjunction with future ROPS to the extent [the city as successor] places such agreements on the ROPS with a demand for payment and funds are available in the . . . [f]und to pay the amounts so requested."[9]

The construction of the parking and alley improvements was completed in November 2013, and the city paid for the construction under its contract with Spiess.

For the next ROP cycle (the fiscal period from January 2014 through June 2014), the city as successor did not renew its request for an allocation from the fund for the parking and alley improvements. However, in approving allocations from the fund for

---

[9]    The mandamus action also encompassed claims relating to the Avon/Dakota revitalization project, discussed below.

other obligations incurred by the city as successor under the LAB agreement, the department acknowledged that the city as successor's obligation to complete the parking and alley improvements was an enforceable obligation that would be eligible for tax increment funds in the next ROP cycle. Accordingly, despite the pending litigation, the city as successor sought a distribution from the fund for its obligation to the city under the loan agreement in its ROP statement for the fiscal period from July 2014 through December 2014. Initially, the department denied this request because of lack of "additional clarification or documentation," but then following the meet and confer process denied the request again in May 2014 because "the [city as successor] did not submit an Oversight Board resolution to [the department] for review prior to entering the loan[]."

In September 2014, the city as successor obtained a stand-alone resolution from the oversight board approving the loan agreement.[10] The city as successor notified the department of the oversight board's approval in October 2014. Meanwhile, in September, the city as successor had once again submitted an ROP statement (this time for the fiscal period from January 2015 through June 2015) seeking a distribution from the fund for the amount owed to the city under the loan agreement (now fixed at $884,429).

In November 2014, the department provisionally denied the city as successor's request for a distribution, noting that it had not yet completed its review of the oversight board's resolution approving the loan agreement. Then, on December 8, 2014, the department disapproved the resolution. The department explained that "it does not appear that the City actually loaned funds to the [city as successor] for amounts owed

---

[10] The oversight board had previously approved the ROP statements in which the city as successor sought allocations from the fund for the amount due the city under the loan agreement, but the board had not separately approved the loan agreement itself.

10

under a contract in which the [city as successor] is a party. Rather, the Cooperation Agreement seeks to reimburse the City for costs it incurred under an agreement between the City and Sp[ie]ss Construction." The department further asserted that even if former subdivision (h) of section 34173 applied to the loan agreement, "a request by the [city as successor] to enter into a loan agreement with the city . . . must be approved by the oversight board and is subject to [the department's] review prior to entering into the agreement. Additionally, the use of the loaned funds must first be presented on a ROPS subject to review by the [oversight board] and [the department]. The [city as successor] took none of these steps prior to entering into the Cooperation Agreement or the alleged expenditure of the funds pursuant to the Cooperation Agreement. Consequently, the [oversight board] has no authority to retroactively approve the actions taken by the [city as successor], and therefore the Cooperation Agreement is not effective." A week later, on December 17, 2014, the department rejected the city as successor's request for a distribution from the fund for the amount owed to the city under the loan agreement for the reasons stated in its letter of December 8.

In July 2015, a notice of hearing was filed in this mandamus proceeding, with the hearing set for December 2015 (later continued to January 2016). In their memorandum, plaintiffs argued that the city as successor was entitled to money from the fund as reimbursement for the costs expended to construct the parking and alley improvements at the packing district project, and plaintiffs set out to refute the various reasons the department had given over time for denying that funding. In response, the department argued that it did not abuse its discretion in denying the city as successor's request for money from the fund related to the parking and alley improvements because: (1) the city as successor was not a party to the construction agreement with Spiess, and therefore that agreement was not an enforceable obligation; (2) the city as successor did not obtain oversight board approval and submit that approval to the department before entering into the loan agreement with the city; and (3) former subdivision (h) of section 34173 did not

11

contemplate loan agreements in which a third party, rather than the successor agency, receives the funds loaned.

The trial court issued its ruling on submitted matter in February 2016. With regard to the parking and alley improvements and the loan agreement, the court noted that the city as successor was seeking to enforce an obligation that "is based on a contract between the City and the construction company." According to the court, while the LAB agreement "clearly created an enforceable obligation, funds are only due to the extent the [city as successor] actually expended funds to complete the parking and alley improvements. Because the [city as successor] is not a party to the construction contract with Spiess, it is the City, not the [city as successor], [that] expended funds to build the parking and alley improvements. There is no reference to the [city as successor] in the contract, and it is the City, not the [city as successor], that is given the express right to oversee construction and terminate the contractor's employment should the need arise. . . . [¶] Although the [loan a]greement anticipates that the City might pay loaned funds directly to the construction company, it does not indicate that the [city as successor] is authorizing or directing the City to enter into the parking construction contract on its behalf. The City Council, not the [city as successor] via the Oversight Board, 'passed and adopted, approved and authorized' the construction, converting it into a City controlled project. Consequently, the City paid funds pursuant to the City's contractual obligations with Spiess Construction, and as the funds sought are not for payment of the [city as successor]'s enforceable obligation, [the department] is correct in its denial of the request."

In March 2016, the trial court issued its order denying the writ petition and dismissing the complaint for declaratory and injunctive relief based on its earlier ruling and entered judgment in favor of the department. This timely appeal followed.

12

B

*The Avon/Dakota Neighborhood Revitalization Project*

The Avon/Dakota neighborhood is a multifamily residential neighborhood that is one of the city's most blighted areas. To revitalize that neighborhood, on June 22, 2010 the authority entered into a revitalization agreement with Related (the revitalization agreement), under which the authority and Related (referred to in the agreement as Developer) were to "jointly and cooperatively prepare a revitalization plan for th[e] neighborhood" and implement that plan. The revitalization agreement recited that "[p]ursuant to one or more separate cooperation agreements between or among the Authority, the City of Anaheim, . . . and/or the Anaheim Redevelopment Agency, . . . to be considered and action taken concurrently with this Revitalization Agreement, it is anticipated that the Authority will be allocated by the City and/or by the Agency certain federal, state, and local funds that will be authorized to be expended to carry out this Revitalization Agreement and provide financial assistance for the Project along with preparation and implementation of the Plan." With respect to the agency, the agreement stated that the sources of the anticipated funds to be provided "may include . . . monies from the Agency's Low and Moderate Income Housing Fund ('Housing Fund')" and "such other funds as may be allocated by . . . Agency to Authority." The revitalization agreement also recited that "Agency receives tax increment revenues pursuant to Section 33670(b) of the [California Community Redevelopment Law] and is required to deposit no less than thirty percent (30%) of the tax increment revenues allocated to Agency into Agency's Low and Moderate-Income Housing Fund ('Housing Fund') pursuant to Sections 33333.10, 33333.11, 33334.2 and 33334.6 of the [California Community Redevelopment Law] and to use such funds in order to increase, improve, and preserve the community's supply of low and moderate-income housing available at an affordable housing cost."

13

The revitalization agreement went on to specify that the authority would provide up to $4.8 million for the preparation and implementation of the revitalization plan. The agreement expressly identified the city and the agency as "intended third party beneficiaries of this Revitalization Agreement, with full right, but no obligation, to enforce the terms hereof." The agreement further provided that "[t]his Revitalization Agreement (together with the other Authority Documents) contains the entire agreement between Authority and Developer with respect to the Properties, and all prior negotiations, understandings and agreements are superseded by this Revitalization Agreement and such other Authority Documents. No modification of any Authority Document (including waivers of rights and conditions) shall be effective unless in writing and signed by the Party against whom enforcement of such modification is sought, and then only in the specific instance and for the specific purpose given." The term "Authority Documents" was defined to mean "this Revitalization Agreement and any and all Implementation Agreements entered into in multiple Phases of revitalization of the Avon/Dakota Neighborhood pursuant hereto."

A week later, on June 28, 2010, the authority, the city, and the agency entered into a cooperation agreement for the funding of the Avon/Dakota revitalization project (the funding agreement). Like the revitalization agreement, the funding agreement noted the agency's obligation to set aside "a certain portion" of its tax increment funding for low and moderate-income housing costs. The funding agreement referred to these funds as "the 'Housing Set-Aside Funds.'" The funding agreement then recited the parties' intent to provide for the city to transfer certain funds to the authority, and for the agency to transfer "certain Housing Set-Aside funds" to the authority, and for the authority to use those funds to implement the revitalization agreement. The funding agreement then provided that the city would transfer up to $3.759 million to the authority, while the

14

agency would transfer up to $1.041 million.[11]  The authority agreed to impose such
conditions, covenants, and restrictions in the implementation of the project "as the
Redevelopment Agency would be required to impose with respect to the use of Housing
Set-Aside Funds under the California Community Redevelopment Law."

On January 31, 2011, the authority and the agency entered into a further
cooperation agreement for additional funding of the Avon/Dakota revitalization project
(the additional funding agreement).  The additional funding agreement recited that the
authority and the agency desired to provide for the agency to transfer additional "Housing
Set-Aside Funds" to the authority and for the authority to use those additional funds to
implement the revitalization agreement.  The additional funding agreement then provided
that the agency would transfer up to $15 million to the authority, and the authority would
use that money to implement the revitalization agreement.  The additional funding
agreement further provided that "[t]he payment obligation of the Redevelopment Agency
hereunder shall be made, at the option of the Redevelopment Agency, from the tax
increment revenues of Anaheim's Merged Redevelopment Project Area, bond proceeds
from Anaheim's Merged Redevelopment Project, inter-fund-transfer, and/or any other
funds of the Redevelopment Agency legally available therefor.  The payment obligation
of the Redevelopment Agency hereunder does not constitute a pledge of any particular
funds and is and shall be subordinate to any pledge or other commitment of the Agency
made in connection with any Redevelopment Agency bonds, now or hereafter issued."[12]

---

[11]     The total amount of funding committed to the authority by the city and the agency
under the funding agreement was equal to the total amount of funding the authority
promised to Related in the revitalization agreement for the preparation and
implementation of the revitalization plan.

[12]     Hereafter, references to the funding agreement encompass the additional funding
agreement as well (unless otherwise noted).

After the additional funding agreement was signed, the authority and Related entered into a written amendment to the revitalization agreement (the amendment to the revitalization agreement). After noting that the funding for the project had been increased by $15 million, the amendment to the revitalization agreement specified that the authority would provide up to $19.8 million for the preparation and implementation of the revitalization plan. The amendment to the revitalization agreement also added a funding schedule and provided that the authority would make moneys available according to that schedule.[13] Under the schedule, the authority was to make $1,113,034 available to Related in fiscal year 2010-2011 (which the schedule noted had already been expended for the acquisition of two properties), $2.5 million a year for each of the eight fiscal years after that, and $1,186,966 for the fiscal year from 2018-2019.[14]

In the first two ROP cycles (through the fiscal period ending December 31, 2012), the city as successor requested, and the oversight board and the department approved, a total disbursement of $5,315,700 from the fund for use in funding the Avon/Dakota revitalization project. In the ROP schedule the city as successor prepared in August 2012 for the January 2013 through June 2013 fiscal period, the city as successor requested $1,989,227 from the fund with respect to the Avon/Dakota revitalization project. In October 2012, the department approved a small portion of the requested amount, but denied the rest based on its understanding that "contracts for these line items were

---

[13]     Specifically, the amendment to the revitalization agreement added a new section 3.2 to the revitalization agreement that provided as follows: "Authority shall make moneys available for the acquisition of Properties and the planning and implementation of the Plan pursuant to the Revitalization Agreement (as amended by this First Amendment) in accordance with the Authority Funding Schedule for the Avon/Dakota Neighborhood Revitalization Plan, attached hereto as Exhibit C and incorporated herein ('Authority Funding Schedule')."

[14]     Hereafter, references to the revitalization agreement are to that agreement as amended (unless otherwise noted).

16

awarded after June 27, 2011." Following the meet and confer process, in December 2012, the department confirmed its denial of the requested distribution on the ground that the revitalization agreement was between the authority and a third party, and the agency was not a party to that agreement. The department further stated, "Section 'M' of the [revitalization agreement] states that pursuant to separate cooperation agreements, the Authority was anticipated to be allocated funds from the City and/or the former RDA. Additional documents do not support the amount claimed on the ROPS . . . ; therefore, Finance determines that this does not create an enforceable obligation on the former RDA. In addition, any cooperation agreements entered would not be considered enforceable pursuant to HSC section 34171(d)(2). Therefore, the items are not enforceable obligations."

Given the department's determination that payments for the Avon/Dakota revitalization project were not for enforceable obligations, the city as successor did not seek any further distribution for that purpose in the next four ROP cycles, and instead the project proceeded with other available funds. In June 2013, however, plaintiffs included a claim related to the denial of funding for the Avon/Dakota revitalization project in this mandamus action. Plaintiffs alleged that Related was an intended third party beneficiary of the agency's obligation to make payments to the authority under the funding agreement and that the revitalization agreement and the funding agreement "must be read together as a single contract between and among all of the parties thereto." Plaintiffs contended that because "Related is a party to and third party beneficiary under the Avon/Dakota Cooperation Agreement and Avon/Dakota Neighborhood Revitalization Agreement and said agreements must be read together as a single contract . . . , those agreements do not constitute agreements 'between the city . . . that created the redevelopment agency and the former redevelopment agency' within the meaning of Health & Safety Code §34171(d)(2)." With respect to this claim, plaintiffs sought a writ compelling the department to set aside its previous actions and determinations and to

17

"issue a formal written determination and directive that . . . the Avon/Dakota Cooperation Agreement and Avon/Dakota Neighborhood Revitalization Agreement . . . are enforceable obligations . . . eligible for payment from the . . . [f]und" and that the city as successor is "entitled to an allocation of moneys from the . . . [f]und in conjunction with future ROPS to the extent [the city as successor] places such agreements on the ROPS with a demand for payment and funds are available in the . . . [f]und to pay the amounts so requested."

In February 2015, the city as successor once again sought a distribution from the fund for use in funding the Avon/Dakota revitalization project. In April 2015, the department again denied that distribution because the agency was not a party to the revitalization agreement.

As we have previously noted, the hearing on plaintiffs' writ petition was eventually set for January 2016. In their memorandum, plaintiffs argued that subdivision (d)(2) of section 34171, which excludes from the definition of "enforceable obligation" "any agreements, contracts, or arrangements between the city, county, or city and county that created the redevelopment agency and the former redevelopment agency," did not apply here because pursuant to Civil Code section 1642 the revitalization agreement and the funding agreement must be construed as a single contract, to which Related was a party, thereby taking the contract out of that limiting provision.[15] Plaintiffs also argued that "Related's rights under the [revitalization agreement] would be obliterated unless [the department's] denial of RPTTF funding is overturned" and thus reversal of the department's decision was necessary to avoid the unconstitutional impairment of Related's contract rights.

---

[15] "Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together." (Civ. Code, § 1642.)

In opposition, the department argued that the revitalization agreement and the funding agreement were *not* a single contract, the cooperation agreement was not an enforceable obligation, and the department's denial of RPTTF funding did not violate Related's rights under the contracts clauses of the federal and state Constitutions.

In its ruling on submitted matter issued in February 2016, the trial court concluded that Related was not a party to the funding agreement such that it could enforce payment from the agency to the authority, and because the revitalization agreement and the funding agreement were not between the same parties, they could not be treated as a single contract under Civil Code section 1642. The court further concluded that it did "not need to address [plaintiffs'] 'impairment of contracts' arguments, as Related has no rights under the [funding agreement]."

As noted above, plaintiffs timely appealed from the resulting judgment in favor of the department.

DISCUSSION

I

*The Parking And Alley Improvements At The Packing District Project*

A

*The Loan Agreement Between The City And The City As Successor*
*Gave Rise To An Enforceable Obligation*

On appeal, plaintiffs contend the city as successor is entitled to money from the fund to repay the loan proceeds used to construct the parking and alley improvements on the packing district project. According to plaintiffs, former subdivision (h) of section 34173 "did *not* require the City to disburse the loan proceeds to the [city as successor] so that the [city as successor] could contract with Spiess. . . . Loan agreements, it must be emphasized, *typically* involve the lender disbursing funds to a party other than the borrower. . . . If the Legislature had intended that the definition of 'loan' as used in

19

[former] §34173(h) should have a narrower meaning it easily could have said so. It did not."

In response, the department argues -- as it did in the trial court -- that "[t]he construction agreement between the City and Spiess is not an enforceable obligation because it does not include any indebtedness incurred by the [city as successor]." That argument goes nowhere, however, because the city as successor did not seek money from the fund to make payments due under the construction contract with Spiess. Rather, the city as successor sought money from the fund to make payments due under *the loan agreement* -- that is, to pay back to the city the amounts the city paid the construction company under the construction contract for the construction of the parking and alley improvements the agency was obligated to provide under the LAB agreement. Thus, the pertinent question here is not whether the construction contract between the city and Spiess was an enforceable obligation, but rather whether the loan agreement between the city and the city as successor gave rise to an enforceable obligation.

As we have seen, former subdivision (h) of section 34173 provided as follows: "The city, county, or city and county that authorized the creation of a redevelopment agency may loan or grant funds to a successor agency for administrative costs, enforceable obligations, or project-related expenses at the city's discretion, but the receipt and use of these funds shall be reflected on the Recognized Obligation Payment Schedule or the administrative budget and therefore are subject to the oversight and approval of the oversight board. An enforceable obligation shall be deemed to be created for the repayment of those loans."

Here, the city loaned funds to the city as successor for an enforceable obligation when, pursuant to the terms of the loan agreement, the city as successor contracted with Spiess and paid for the construction of the parking and alley improvements the agency was legally obligated to provide under the LAB agreement (which no one disputes was an

20

enforceable obligation). Thus, at first glance at least, it does appear that former subdivision (h) of section 34173 was satisfied here.

The department contends, however, that the statute was *not* satisfied because "the [city as successor] never received any money from the City, and therefore never had a repayment obligation under the . . . loan agreement." According to the department, because former subdivision (h) of section 34173 provides that "[a]n enforceable obligation shall be deemed to be created for the *repayment* of those loans" (italics added), a repayment obligation is a necessary requirement of the statute, and there was no such obligation here.

We disagree. To say that the city as successor "never had a repayment obligation under the . . . loan agreement" because "the [city as successor] never received any money from the City" is to ignore the terms of the loan agreement. As we have seen, the loan agreement specifically provided that the city as successor would "repay the City Loan to City" upon receiving money from the fund to do so. It is of no matter that the loan proceeds were not first paid to the city as successor, so that the city as successor could pay them to the construction company, and it is likewise of no matter that the city as successor was not a party to the construction contract. There is no dispute that the *only* reason the city entered into the contract with Spiess in the first place was because the department had thwarted (rightly or wrongly) the city as successor's earlier attempts to obtain money from the fund to pay for the construction of the parking and alley improvements that the agency was obligated to provide under the terms of the LAB agreement, and the city wanted to "assist the [city as successor] by providing a loan to the [city as successor] . . . to enable the [city as successor] . . . to pay for the construction of the Parking and Alley Improvements . . . as required by the LAB" agreement, which qualified as an enforceable obligation. That the loan agreement allowed the city to contract with the construction company and disburse the loan proceeds directly to the construction company did not alter the fundamental *substance* of the transaction as a

21

loan, under which the city was lending money to the city as successor with the right to be paid back. (See Civ. Code, § 3528 ["The law respects form less than substance"].) Just as the average person who borrows money to buy a house or a car never personally receives the borrowed funds, the city as successor borrowed money from the city here even though the city as successor did not receive the borrowed funds, but instead agreed the city could pay those funds directly to the construction company.

As for the department's backup assertion that loan agreement did not give rise to an enforceable obligation because the city as successor's "obligation to repay the loan was contingent on [the department] approving the City-Spiess construction contract," "which never occurred," we are not persuaded. The loan agreement did provide that "Successor Agency shall repay the City Loan to City promptly upon receipt of RPTTF moneys for the ROPS 13-14A period, and for and during each subsequent ROPS periods, if necessary, to repay the City Loan in full; provided however, that this Agreement and the Parking and Alley Construction Contract shall have been approved by the DOF as enforceable obligations on ROPS 13-14A (and each subsequent ROPS, as applicable)." However, the provision relating to the department approving the contract with Spiess as an enforceable obligation appears to have been included in contemplation of the possibility that the city as successor might be made a party to that contract. This possibility was also suggested in the recitals in the loan agreement, which provided that "the Successor Agency and City desire to enter into a construction contract with Spiess Construction Co. Inc. ('Contractor') for the Parking and Alley Improvements." Ultimately, however, the city as successor was *not* made a party to the construction contract, and thus there was no occasion for the department to approve that contract as an enforceable obligation during the ROP cycle. Under these circumstances, we do not construe the absence of that unnecessary approval as an unfulfilled condition precedent to the obligation of the city as successor to pay back the loan the city made by paying the

22

construction company to complete the parking and alley improvements the agency was legally bound to provide under the terms of the LAB agreement.

In summary, we conclude the loan agreement between the city and the city as successor gave rise to an enforceable obligation, and the trial court erred in concluding otherwise.

B

*The City As Successor's Failure To Obtain Prior Approval From*

*The Oversight Board To Enter Into The Loan Agreement With*

*The City Did Not Make The Agreement An Unenforceable Obligation*

As we have noted already, in opposing the relief plaintiffs sought in the trial court pertaining to the denial of funding to repay the loan from the city pertaining to the parking and alley improvements, the department argued that the city as successor did not obtain oversight board approval and submit that approval to the department *before* entering into the loan agreement with the city. On appeal, plaintiffs contend that even if prior approval *was* required (which they dispute), this amounts to no more than "hyper-technical non-prejudicial error" and thus cannot justify the trial court's denial of relief on this claim.

In a footnote in its respondent's brief, the department contends we should "remand this matter to the trial court for review of" this issue because "[t]he trial court did not address this argument." In support of this suggestion of remand, however, the department offers no citation to authority, and we are not aware of any authority that would justify the department's request. "It is judicial action and not judicial reasoning which is the subject of review." (*El Centro Grain Co. v. Bank of Italy, etc.* (1932) 123 Cal.App. 564, 567.) Thus, it was incumbent on plaintiffs in this appeal to show that the trial court erred in the action that court took on their mandamus petition, namely, denying them relief on their claim relating to the city as successor's claim for money from the fund to repay the loan from the city. To show error in that judicial action, plaintiffs in

23

their opening brief understandably sought to refute *all* of the arguments the department offered in its opposition in the trial court, including the argument that plaintiffs should get no relief because the city as successor did not obtain prior approval from the oversight board to enter into the loan agreement with the city, and the department had every opportunity to respond on that issue in its respondent's brief. Thus, the issue is properly before us for decision in determining whether the trial court's denial of writ relief amounted to judicial error, and there is no reason to remand the case to the trial court for that court to address the issue in the first instance. Accordingly, we turn to this issue.

The department appears to contend that the trial court's denial of writ relief was proper given the failure of the city as successor to obtain approval of the oversight committee *before* entering into the loan agreement with the city because that failure prevented the oversight board from exercising its supervisory power over the city as successor. We disagree. It is true there are provisions in the dissolution law that require a successor agency to obtain approval of the oversight committee *before* entering into an agreement with the municipality that created the redevelopment agency the successor agency succeeded. Subdivision (a) of section 34178 provides "that a successor entity wishing to enter . . . into agreements with the city, county, or city and county that formed the redevelopment agency that it is succeeding may do so . . . upon obtaining the approval of its oversight board." Similarly, section 34180 identifies various "successor agency actions" that "shall first be approved by the oversight board," and included in those actions is "[a] request by the successor agency to enter . . . into an agreement with the city, county, or city and county that formed the redevelopment agency that it is succeeding pursuant to Section 34178." (§ 34180, subd. (h).) We agree with the department (and disagree with plaintiffs) that these provisions require a successor agency to obtain oversight board approval *before* entering into a contract with the municipality that created the redevelopment agency the successor agency succeeded. Where we part

24

ways with the department, however, is with respect to the department's suggestion that the failure to obtain prior approval necessarily justifies the denial of any request for money from the fund arising from an agreement that was not approved in advance.

The department contends this should be the result because the failure to obtain prior approval prevents the oversight board from exercising its supervisory power over the successor agency. That is not actually true, however, particularly with respect to a *loan* agreement under former subdivision (h) of section 34173. This is so for two reasons. First, with respect to *any* agreement that an oversight board may approve between a successor agency and the municipality that formed the redevelopment agency the successor agency succeeded, subdivision (h) of section 34180 provides that "[a]ny actions to establish" such agreements "are invalid until they are included in an approved and valid Recognized Obligation Payment Schedule." Second, with respect to loan agreements in particular, former subdivision (h) of section 34173 provided that "[t]he city, county, or city and county that authorized the creation of a redevelopment agency may loan or grant funds to a successor agency for administrative costs, enforceable obligations, or project-related expenses at the city's discretion, but the receipt and use of these funds shall be reflected on the Recognized Obligation Payment Schedule or the administrative budget and therefore are subject to the oversight and approval of the oversight board." In other words, under the dissolution law, even if a loan agreement between a successor agency and the municipality that created the redevelopment agency the successor agency succeeded is not approved in advance, the oversight board is still able to exercise its supervisory power over the successor agency with regard to the loan agreement because: (1) any actions to establish that agreement are invalid until the agreement is included in an approved and valid ROP schedule; and (2) receipt and use of the borrowed funds must be reflected on an ROP schedule or administrative budget. In these ways, the loan agreement is subject to the oversight and approval of the oversight

25

board even if the successor agency failed to obtain the oversight board's approval before entering into the agreement.

Here, the oversight board approved ROP schedules that included requests for money from the fund to pay back the amount due the city under the loan agreement on multiple occasions, and the oversight board approved the loan agreement separately on one occasion -- albeit after the city as successor entered into that agreement. In this manner, the oversight board exercised its supervisory power over the city as successor pursuant to the terms of the dissolution law. Thus, contrary to the department's argument, the failure of the city as successor to obtain *prior* approval from the oversight board before entering into the loan agreement did not prevent the oversight board from exercising its supervisory power over the city as successor with respect to this particular transaction and thus did not give the department a valid reason to deny the city as successor's request for money from the fund to repay the loan.

For the foregoing reasons, we conclude the trial court erred when it denied plaintiffs' petition for a writ of mandate pertaining to the parking and alley improvements at the packing district project.

II

*The Avon/Dakota Neighborhood Revitalization Project*

A

*Integration Of The Revitalization Agreement And The Funding Agreement*
*Is Immaterial To Plaintiffs' Impairment Argument*

On appeal, plaintiffs contend that "[u]nder settled principles of law, the [revitalization agreement and the funding agreement] must be viewed as constituting a single integrated contract." They then argue that "retroactive invalidation of [that] Agreement under §34171(d)(2) would deny Related over $10 million of the $16,041,000 in [agency] funds promised to it in the Revitalization Agreement and thereby unconstitutionally impair its vested contract rights." (See U.S. Const., art. I, § 10; Cal.

26

Const., art. 1, § 9.) Given this result, they contend, "§34171(d)(2) must be interpreted as *not* to apply when the invalidation of a multi-party contract to which a city, its former redevelopment agency, and a private person or entity are parties would substantially impair the private person's or entity's contract rights."[16] Plaintiffs contend this result is consistent with the rule that, if possible, a statute should be interpreted in a manner that is consistent with, rather than in conflict with, the Constitution. (See *City of Cerritos v. State of California* (2015) 239 Cal.App.4th 1020, 1035.)

The problem with plaintiffs' argument is that they have attempted to frame it as an issue of statutory interpretation, when what they are really raising is an "as applied" constitutional challenge to the statute. It is true that "[i]f a statute is susceptible of two constructions, one of which will render it constitutional and the other unconstitutional in whole or in part, or raise serious and doubtful constitutional questions, the court will adopt the construction which, without doing violence to the reasonable meaning of the language used, will render it valid in its entirety, or free from doubt as to its constitutionality, even though the other construction is equally reasonable." (*Miller v. Municipal Court* (1943) 22 Cal.2d 818, 828.) What that rule means, however, is that if a particular construction of a statute will render the statute unconstitutional or raise serious questions about the constitutionality of the statute *on its face* -- that is, without regard to "its application to the particular circumstances of an individual" (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084) -- then that construction is to be avoided if reasonably possible. That does not mean, however, that we ought to adopt a particular interpretation

---

**16** Recall that subdivision (d)(2) of section 34171 excepts from the definition of " 'enforceable obligation' " "any agreements, contracts, or arrangements between the city, county, or city and county that created the redevelopment agency and the former redevelopment agency."

27

of a statute applicable to all cases because *in some circumstances* a constitutional violation may result from that interpretation.

Here, plaintiffs do not contend that if subdivision (d)(2) of section 34171 is applied to every contract in which a private third party is involved along with a former redevelopment agency and the municipality that formed it, an unconstitutional impairment of contract will necessarily result every time, nor do they contend that there is a serious question as to whether a constitutional violation will result every time. Instead, they ask us to interpret the statute only so that it does not apply "when the invalidation of a multi-party contract to which a city, its former redevelopment agency, and a private person or entity are parties would substantially impair the private person's or entity's contract rights." That is nothing more and nothing less than an "as applied" challenge to the constitutionality of the provision, because under plaintiffs' argument the statute should be deemed unconstitutional only when the application of the statute "would substantially impair the private person's or entity's contract rights." As will become apparent below, the determination of whether contract rights have been substantially impaired by legislation depends on the specific contract at issue. So the real question here is not whether subdivision (d)(2) of section 34171 should be interpreted so that it is not facially unconstitutional, or to avoid a serious question of facial unconstitutionality, but rather whether the statute violates the contract clauses of the federal and state Constitutions *in particular circumstances*. Thus, we will address plaintiffs' argument as an "as applied" challenge to the constitutionality of the statute under the facts presented by this case.

In addressing that challenge, the question the trial court found dispositive -- whether the revitalization agreement and the funding agreement are to be treated as a single integrated contract or as separate contracts -- is immaterial. This is so because even if plaintiffs are wrong on the integration issue and the two contracts are separate, it is undisputed that subdivision (d)(2) of section 34171 would operate to invalidate the

funding agreement to the extent that agreement obligated the agency to provide up to $16.041 million to the authority to fund the Avon/Dakota revitalization project. And because the revitalization agreement and the funding agreement are unquestionably *interdependent* -- because the revitalization agreement clearly contemplated that the authority would obtain the funding the authority promised to give Related from the city and the agency pursuant to the funding agreement -- even if the contracts are separate, the issue still arises as to whether the invalidation of the funding agreement resulted in an unconstitutional impairment of the contractual rights of Related under the revitalization agreement. Thus, we need not answer the question of whether the two agreements were a single integrated contract or two separate contracts. The significant question for us is whether the invalidation of the agency's promise to provide funds to the authority, so that the authority could provide them to Related, unconstitutionally impaired Related's contractual rights.

In a petition for rehearing, the department contends the question of integration is *not* immaterial because plaintiffs' constitutional argument cannot succeed unless there is only a single contract. In the department's view, "the invalidation of one agreement [cannot] impair a separate, non-integrated agreement involving different parties and a different transaction," and here "[t]he [funding] agreement and the [r]evitalization [a]greement involve two separate transactions serving two different functions.

We find no merit in this argument. First, the funding agreement and the revitalization agreement are anything but separate. The only reason the funding agreement exists at all is to provide a funding mechanism for the revitalization agreement. Thus, the two agreements do not, by any stretch of the imagination, "serve separate purposes," as the department contends. The purpose of *both* agreements is to facilitate the revitalization of the Avon/Dakota neighborhood. The agreements are entirely interdependent, not separate.

29

Second, the authority on which the department relies for this argument -- *Fuentes v. Fuentes* (1961) 188 Cal.App.2d 715 -- is entirely inapposit. In *Fuentes*, the parties to a marital dissolution proceeding entered into a property settlement agreement that, among other things, provided for the husband to pay the wife $75 per month in child support for each of the parties' two children. (*Id.* at p. 717.) The trial court later entered an order reducing the husband's child support obligation to $55 per month for each child. (*Id.* at p. 716.)

On appeal from the order modifying child support, the wife argued that the modification order was an unconstitutional impairment of the obligation of a contract. (*Fuentes v. Fuentes*, *supra*, 188 Cal.App.2d at p. 717.) The appellate court disagreed, explaining that " '[t]he adjustment of the property rights of the parties and the agreement to pay . . . for the support of the minor child[ren] are separate and severable provisions of the contract.' " (*Ibid.*)

The fact that child support and property rights are "separate and severable" in the context of a marital dissolution proceeding has no bearing whatsoever on whether the funding agreement and the revitalization agreement in this case were also "separate and severable." As we have explained, they were not; instead, they were entirely interdependent. And thus the question remains whether the invalidation of the funding agreement between the agency and the authority unconstitutionally impaired Related's rights under the revitalization agreement. It is to that question that we now turn.[17]

---

**17** Because the trial court did not reach this issue, the department argues (once again) that we should "remand this case to allow the trial court an opportunity to address [the] contract clause argument." Again, however, the department offers no authority, and no reasoning, in support of this argument. Because the issue is one of law on a record the parties had every opportunity to fully develop, we will address it.

## B

### *The Statutory Invalidation Of The Funding Agreement With Respect To The Agency Results In An Unconstitutional Impairment Of Related's Rights Under The Revitalization Agreement*

"The contract clauses of both the federal and California Constitutions prohibit a state from passing laws impairing the obligation of contracts.  (U.S. Const., art. I, § 10, cl. 1; Cal. Const., art. I, § 9.)  Pursuant to these clauses, the state's ability to modify its own contracts with other parties, or contracts between other parties, is limited.  [Citations.]  [¶]  Not every impairment runs afoul of the contract clauses, however.  ' " The constitutional prohibition against contract impairment does not exact a rigidly literal fulfillment; rather, it demands that contracts be enforced according to their 'just and reasonable purport"; not only is the existing law read into contracts in order to fix their obligations, but the reservation of the essential attributes of continuing governmental power is also read into contracts as a postulate of the legal order.' " (*Teachers' Retirement Bd. v. Genest* (2007) 154 Cal.App.4th 1012, 1026-1027.)

The first question under the contract clauses is whether the obligations of any contract have actually been impaired.  (See *City of Torrance v. Workers' Comp. Appeals Bd.* (1982) 32 Cal.3d 371, 377 (*City of Torrance*).)  " 'The obligations of a contract are impaired by a law which renders them invalid, or releases or extinguishes them . . . .' " (*Ibid.*)  But complete invalidation, release, or extinction of a contractual obligation is not required for there to be an impairment.  In addition, "impairment . . . has been predicated of laws which without destroying contracts derogate from substantial contractual rights." (*Home Building & Loan Asso. v. Blaisdell* (1934) 290 U.S. 398, 431 [78 L.Ed. 413, 425].)

In its respondent's brief, the department contends "Related has no relevant contract rights to be impaired" here, but then fails to explain how this could be so, when (1) the authority promised to provide Related with up to $19.8 million for the

31

Avon/Dakota revitalization project; (2) the revitalization agreement expressly anticipated that the authority would get the bulk of those funds -- $16.041 million -- from the agency pursuant to the funding agreement; and (3) subdivision (d)(2) of section 34171 (as well as subdivision (a) of section 34178) rendered the funding agreement unenforceable. Not only did Related have "relevant contract rights to be impaired," but its contract rights *were* impaired, because the invalidation of the funding agreement destroyed the funding mechanism that in large part made the revitalization agreement possible in the first place.

To the extent the department argues, in support of its assertion that "Related has no relevant contract rights to be impaired," that " '[A] statute does not violate the Contract Clause simply because it has the effect of restricting, or even barring altogether, the performance of duties created by contracts entered into prior to its enactment,' " the department is mixing apples and oranges. At this point, we are not concerned with whether any impairment that occurred violated the contract clauses, but with whether there was any impairment in the first place. Those are two distinct questions. As our Supreme Court has explained, "a finding that the state in the exercise of its police power has abridged an existing contractual relationship does not in and of itself establish a violation of the contract clause. It is the beginning, not the end of the analysis. A finding of impairment merely moves the inquiry to the next and more difficult question -- whether that impairment exceeds constitutional bounds." (*City of Torrance*, *supra*, 32 Cal.3d at p. 377.) Thus, while the department is correct to the extent it can be understood to argue that abridgement of a contractual relationship does not necessarily violate the contract clause, the department cites no authority for the implied assertion that the abridgement of a contractual relationship is not an impairment of a contractual obligation.

This case is distinguishable from *City of Galt v. Cohen* (2017) 12 Cal.App.5th 367, in which this court found no impairment of contract. In that case, City of Galt contended that "not allowing it to use . . . tax allocation bond proceeds to fund [projects

pursuant to a cooperation agreement with City of Galt's former redevelopment agency] unconstitutionally impairs contracts, namely the obligations of the bondholders." (*Id.* at p. 378.)  This court concluded that if City of Galt was actually claiming that its own constitutional rights were being impaired, "then it has no standing because a municipality may not complain that the state is impairing its contract." (*Ibid.*)  If, on the other hand, City of Galt was attempting to assert the bondholders' rights, "then City of Galt has no standing to assert the rights of others." (*Ibid.*)  In any event, the court concluded, "City of Galt makes no attempt to establish that bondholders will not be paid under the terms of the bonds," and because "the former redevelopment agency had no contractual obligation to the bondholders to use the bond proceeds to fund [the projects under the cooperation agreement], [the department] did not impair those contracts (the bond agreements) when it determined that the bond proceeds could not be used to fund [those] projects." (*Id.* at pp. 378, 379)

In contrast to the situation in *City of Galt*, here plaintiffs are not asserting that any vested contractual rights of a municipality or of absent bondholders are being impaired. Instead, they are asserting that the rights of Related -- a private developer and a party to this proceeding -- are being impaired.  Thus, *City of Galt* does not govern here.

In a petition for rehearing, the department argues that Related cannot assert that its contractual rights were impaired by the invalidation of the funding agreement because "no statutory or contractual provision" *required* the authority to use funds from the agency to fulfill the authority's obligation to Related under the revitalization agreement. According to the department, because "the loss of [agency] funds to be provided in the [funding] [a]greement d[id] not extinguish the [authority's] duty [to Related] to provide funding under the [r]evitalization [a]greement," and "because the [authority] still has a duty to perform under the [r]evitalization [a]greement, Related . . . cannot assert impairment of its contractual rights."

33

We are not persuaded. In substance, the department's argument is that because the invalidation of the funding agreement did not invalidate, release, or extinguish the authority's contractual obligation under the revitalization agreement to provide funding to Related for the Avon/Dakota revitalization project, there was no impairment of Related's contractual rights under the revitalization project. It is clear from the case law, however, that a total invalidation, release, or extinguishment of a contractual obligation is not the sine qua non of an impairment of contract for purposes of the contract clauses. As we have noted, "impairment . . . has been predicated of laws which without destroying contracts derogate from substantial contractual rights." (*Home Building & Loan Asso. v. Blaisdell*, *supra*, 290 U.S. at p. 431 [78 L.Ed. at p. 425].)

Related's right to receive up to $19.8 million from the authority to prepare and implement the plan for the Avon/Dakota revitalization project is nothing if not a substantial contractual right. Moreover, there can be no doubt that the authority and Related both understood and intended that the authority would get the bulk of the $19.8 million -- $16.041 million -- from the agency pursuant to the funding agreement. This most readily appears from the terms of the amendment to the revitalization agreement. That amendment specifically recited that under the original funding agreement, the agency "agreed to transfer to [a]uthority One Million Forty-One Thousand Dollars ($1,041,000) from [the a]gency's Housing Set-Aside funds" and the "[a]uthority agreed to use such transferred funds to implement the [r]evitalization [a]greement." The amendment then noted that the agency and the authority had entered into the additional funding agreement, which had increased "the funding available to [the a]uthority for expenditures under the [r]evitalization [a]greement by an additional Fifteen Million Dollars." And the additional funding agreement specifically provided for the "[a]gency's transfer of additional Housing Set-Aside funds to the . . . [a]uthority" in the sum of $15 million.

Thus, there can be no doubt that the bulk of the funds the authority committed to Related for the Avon/Dakota revitalization project were to come to the authority from the agency under the funding agreement, and indeed the department points to nothing that contradicts that fact. That the authority may not have expressly *promised* to Related in the revitalization agreement what the specific source of the funds to be made available under the agreement would be does not, in our view, have a material impact on whether an impairment of Related's contractual rights occurred here. The express understanding of the parties that the bulk of the funds would come from the agency, along with the absence of any evidence of any other source of funds available to the authority that could have supplied those funds, persuades us that when the funding agreement was invalidated, Related's rights under the revitalization agreement were impaired because the authority no longer had access to the specific source of funds that everyone understood and agreed would be used to fuel the Avon/Dakota revitalization project.

Having concluded that subdivision (d)(2) of section 34171 operated here to impair Related's contractual rights under the revitalization agreement, we turn to the next question in a contracts clause analysis -- whether that impairment exceeded constitutional bounds. "Legislation adjusting the rights and responsibilities of contracting parties must be upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption." (*United States Trust Co. v. New Jersey* (1977) 431 U.S. 1, 22 [52 L.Ed.2d 92, 109-110] (*United States Trust*).) "The extent of impairment is certainly a relevant factor in determining its reasonableness." (*Id.* at p. 27 [52 L.Ed.2d at p. 113].) It has also been said that "*United States Trust* places the justification for an impairment of a contractual funding obligation under the light of strict scrutiny." (*California Teacher's Assn. v. Cory* (1984) 155 Cal.App.3d 494, 511.) "In considering the standard applicable to such a *fiscal* obligation the court said: 'As with laws impairing the obligations of private contracts, an impairment may be constitutional if it is reasonable and necessary to serve an important public purpose. In applying this standard, however, complete

deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's *self-interest* is at stake.  A governmental entity can always find a use for extra money, especially when taxes do not have to be raised.  If a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all.'  (Fns. omitted.)"  (*Cory*, at p. 511, quoting *United States Trust*, *supra*, 431 U.S. at pp. 25-26 [52 L.Ed.2d at pp. 111-112].)  Thus, "*United States Trust* rules out, as a permissible justification, a legislative purpose simply to expend the obligated money for a purpose deemed a better expenditure."  (*Cory*, at p. 512.)

The department contends that the impairment of Related's contract rights "survives this constitutional challenge because [the department's] decisions here were based on a law that has a significant and legitimate public purpose."  According to the department, "the State's interest in passing the Dissolution Law far exceeds any possible contractual interest lost by Related" because, essentially, the Legislature was seeking to address a financial emergency.  Moreover, the department contends, "[t]he Legislature appropriately tailored the Dissolution Law to the public's interest, noting that state and local governments were facing declines in revenues and increased need for core governmental services."

We are not persuaded.  The impairment here was unquestionably significant, because the Legislature rendered the funding agreement -- the mechanism by which the revitalization agreement was to be funded -- almost completely inoperative.  While certainly *the city* was still bound to perform its funding obligation to the authority under the funding agreement, the city's funding obligation amounted to less than 20 percent of the total funding that was to be provided.  The remaining 80 percent was the responsibility of the agency, but subdivision (d)(2) of section 34171 renders that funding obligation unenforceable.

36

More important, however, is that the state's justification for rendering the agency's funding obligation unenforceable is the perceived justification *Cory* says was ruled out by *United States Trust*, namely, to spend the money somewhere else that the Legislature deemed more worthy. As our Supreme Court noted in the opening sentence of *Matosantos*, the dissolution law was "intended to stabilize school funding by reducing or eliminating the diversion of property tax revenues from school districts to the state's community redevelopment agencies." (*Matosantos*, *supra*, 53 Cal.4th at p. 241.) Thus, the Legislature determined that the tax increment funds that previously went to redevelopment agencies to, among other things, increase the supply of affordable housing for low and moderate-income households, should instead go to school districts, to help reduce the burden on the state to provide state funds for schools. (See *id.* at pp. 242-252.) However laudable, under *Cory* and *United States Trust* this was not a permissible justification for impairing vested contractual rights like those that belonged to Related here.

Moreover, it should be noted that subdivision (d)(2) of section 34171 is not reasonably tailored to achieve its ostensible purpose. As plaintiffs contend in their reply brief, "when the Dissolution Law was adopted, the Legislature still saw fit to preserve all other redevelopment agency bond and contract obligations to private parties (see . . . §34171(d)(1)(A)-(E))," but Related's contractual rights were *not* preserved due to the circumstance that Related's funding was to come, not directly from the agency, but through the middleman of the authority. The department offers no valid reason for preserving the contractual rights of a private party that entered into a contract directly with a redevelopment agency, but destroying the contractual rights of a private party that instead entered into a contract with the city that created the redevelopment agency (or an entity treated as the equivalent of the city, like the authority here) that was to be funded pursuant to a related contract between the city and the agency the city created.

37

For the foregoing reasons, the Legislature's impairment of Related's contractual rights under the revitalization agreement by means of its invalidation of the funding agreement between the agency and the authority under subdivision (d)(2) of section 34171 (and subdivision (a) of section 34172) was unconstitutional and invalid. Accordingly, the trial court erred when it denied plaintiffs' petition for a writ of mandate pertaining to the funding of the Avon/Dakota revitalization project.

III

*Prejudgment Interest*

In the trial court, plaintiffs argued (briefly) that they were entitled to prejudgment interest under Civil Code section 3287, subdivision (a) "on the sums wrongfully withheld."[18] The department disagreed. The trial court never reached the issue because that court determined (erroneously) that plaintiffs were not entitled to any relief.

On appeal, plaintiffs assert that the city as successor is entitled to prejudgment interest, and they ask that our "ruling include a direction for the trial court, upon remand, to include an appropriate award of prejudgment interest in the writ of mandate and judgment to be entered." The department responds that the case should be remanded to the trial court for *that* court to determine whether plaintiffs are entitled to prejudgment interest. In reply, plaintiffs assert this is a "purely legal issue that should be resolved by this Court." In support of that assertion, they cite Code of Civil Procedure section 43 and *Pacific S. P. Co. v. U. S. Fidelity etc. Co.* (1921) 185 Cal. 515.

---

[18] "A person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in the person upon a particular day, is entitled also to recover interest thereon from that day, except when the debtor is prevented by law, or by the act of the creditor from paying the debt. This section is applicable to recovery of damages and interest from any debtor, including the state or any county, city, city and county, municipal corporation, public district, public agency, or any political subdivision of the state." (Civ. Code, § 3287, subd. (a).)

38

Section 43 of the Code of Civil Procedure provides (in relevant part) that "[t]he Supreme Court, and the courts of appeal, may affirm, reverse, or modify any judgment or order appealed from, and may direct the proper judgment or order to be entered, or direct a new trial or further proceedings to be had. *In giving its decision, if a new trial be granted, the court shall pass upon and determine all the questions of law involved in the case, presented upon such appeal, and necessary to the final determination of the case.*" (Italics added.) Meanwhile, the court in *Pacific Sewer Pipe* held that "[w]here a case is determined upon an agreed statement of facts which discloses every fact essential to a correct judgment, and the trial court draws an incorrect conclusion therefrom, the correct judgment will be ordered upon a reversal." (*Pacific S. P. Co. v. U. S. Fidelity etc. Co.*, *supra*, 185 Cal. at p. 519.) Essentially, plaintiffs rely on these authorities for the proposition that we should decide whether the city as successor is entitled to prejudgment interest on any sum wrongfully withheld by the department, rather than allowing the trial court to decide that issue in the first instance on remand, because the issue is one of law that we can decide just as easily as the trial court.

Accepting plaintiffs' invitation to us to address this issue under the foregoing authorities, we conclude the city as successor is *not* entitled to prejudgment interest. It is true that when a mandamus action is properly characterized as an action for "damages" within the meaning of Civil Code section 3287, the claimant may recover prejudgment interest when three conditions are satisfied: "(1) There must be an underlying monetary obligation; (2) the recovery must be certain or capable of being made certain by calculation; and (3) the right to recovery must vest on a particular day." (*Tripp v. Swoap* (1976) 17 Cal.3d 671, 682 & fn. 12, disapproved on other grounds in *Frink v. Prod* (1982) 31 Cal.3d 166, 180.) As we will explain, however, plaintiffs have not shown to our satisfaction that they fall within this rule.

The first issue is whether this case can properly be characterized as an action for "damages." For purposes of Civil Code section 3287, damages are the

39

"compensation . . . in money" that may be recovered from "the person in fault" by "[e]very person who suffers detriment from the unlawful act or omission of another." (Civ. Code, § 3281; see also *Union Pacific Railroad Co. v. Santa Fe Pacific Pipelines, Inc.* (2014) 231 Cal.App.4th 134, 198-199 [applying this definition of "damages" to Civil Code section 3287].)  If this is an action for damages, then the department would have to be "the person in fault," the city as successor would have to be the "person who suffer[ed] detriment from the unlawful act or omission of" the department, and the city as successor would be entitled to recover "compensation . . . in money" from the department for the detriment suffered.  But plaintiffs are not seeking a money judgment against the department in this case, or even a writ commanding the department to pay money to the city as successor.  The department's role in this matter was to determine "the enforceable obligations and the amounts and funding sources of the enforceable obligations" (§ 34177, subd. (m)(1).)  The department was *not* responsible for paying money to the city as successor, or even allocating money from the fund (or from any other source) to the city as successor; that was the role of the county auditor-controller.  (See § 34183.)  Thus, the writ relief to which plaintiffs are entitled here is a writ commanding the department to vacate its previous determinations denying the city as successor's claims for money from the fund to repay the loan from the city pertaining to the parking and alley improvements at the packing district project and to fund the Avon/Dakota revitalization project and to issue new determinations approving those claims.  Under such a writ, the department will not be ordered to pay money to the city as successor as compensation for detriment the city as successor suffered from an unlawful act or omission of the department.  In other words, the department will not be ordered to pay the city as successor "damages," and absent an award of damages, there can be no prejudgment interest under Civil Code section 3287.

As if that conclusion were not sufficient, the second issue is whether plaintiffs have shown that they have satisfied the three conditions that must be met for an award of

40

prejudgment interest even when the underlying action is properly characterized as one for damages, and plaintiffs lose on that issue, too. For the same reason plaintiffs have not shown that the relief they are entitled to here is an award of *damages* from the department, they have not shown that the department owes them an "underlying monetary obligation" on which an award of prejudgment interest could be based. The department's obligation was to approve the city as successor's claims for money from the fund, not to pay the city as successor money. The former is not a *monetary* obligation that would support an award of prejudgment interest.

Moreover, plaintiffs have not shown that they had a right to recover a sum certain (or a sum capable of being made certain by calculation) that vested on a particular day. The only assertion they offer on this condition is that the dissolution law "requires the Auditor-Controller to make ROPS payments to the Successor Agency each June 1 and January 2." But it is not clear to us that the city as successor necessarily had a right to receive all of the money it claimed on a particular date. Indeed, even in their petition for writ relief in this case, plaintiffs sought a writ commanding the department to issue a formal written determination and directive that, among other things, plaintiffs "are entitled to an allocation of moneys from the Trust Fund . . . to the extent . . .funds are available in the Trust Fund to pay the amounts . . . requested." If the city as successor's right to money from the fund on a particular day was dependent on the presence of money in that fund on that day, then we cannot say the city as successor had a right to recover that sum *on that day*, which is a prerequisite to an award of prejudgment interest.

For all of the foregoing reasons, we conclude plaintiffs are not entitled to prejudgment interest in this case.

IV

*Relief*

As we have concluded that the trial court erred in denying plaintiffs' petition for writ relief challenging the department's denial of the city as successor's claims for money

41

from the fund to repay the loan from the city pertaining to the parking and alley improvements at the packing district project and to fund the Avon/Dakota revitalization project, we must reverse the judgment. Because plaintiffs have not tried to suggest the terms of the writ to which they believe they are entitled, we will leave it to the trial court to determine in the first instance on remand, with the input of the parties as necessary, the appropriate terms of an order, judgment, and writ of mandate in this case. In that regard, it will be up to the trial court, with the input of the parties, to determine the proper resolution of plaintiffs' complaint for declaratory and injunctive relief.

## DISPOSITION

The judgment is reversed, and the case is remanded to the trial court with instructions to vacate its order denying plaintiffs' petition for writ of mandate and dismissing plaintiffs' complaint for declaratory and injunctive relief and to enter a new order granting plaintiffs' writ petition consistent with this opinion and granting such other relief as the trial court may deem appropriate. Plaintiffs shall recover their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(2).)


/s/
Robie, J.



I concur:


/s/
Blease, Acting P.J.

42

DUARTE, J., Concurring and Dissenting

After reconsidering and reviewing this matter further in light of the rehearing petition and answer, I now respectfully dissent from Parts II and IV (in part) because I no longer believe the dissolution statutes worked to impair contracts as to the Avon/Dakota revitalization project. I concur in Part III, as to prejudgment interest. Because Part I was not challenged in the rehearing petition, I will concur in the result therein.[1]

## BACKGROUND

On June 22, 2010, the City of Anaheim approved an agreement (dated for identification purposes June 1, 2010), between the Anaheim Housing Authority (Authority) and real party in interest The Related Companies of California LLC (Related) to improve (revitalize) what was characterized as the blighted Avon/Dakota neighborhood. The revitalization agreement provided that one or more "cooperation agreements" between Related and the Authority, the City of Anaheim (City), or the Anaheim Redevelopment Agency (RDA), would use federal, state, and local funds to "provide financial assistance for the Project along with preparation and implementation

---

[1] My concerns regarding Part I include the implication in the relevant factual recitation that the Department acted improperly by changing its reasons for disapproving ROPS items. (Maj. opn., *ante*, at pp. 6-12.) As the City conceded in the trial court, a typical ROPS finding does not govern a subsequent ROPS decision. (See *City of Brentwood v. Campbell* (2015) 237 Cal.App.4th 488, 495 [ROPS decision included the caveat that " 'An item included on a future ROPS may be denied even if it was not questioned from the preceding ROPS' "] (*Brentwood*).) Such caveats were included in the ROPS decisions in this case. It is the Department's *final* decisions that are now at issue. (Cf. *id.* at p. 505 [Brentwood "had the statutory remedy of petitioning the Department for a 'final and conclusive' determination of approval for subsequent payments for that enforceable obligation"]; see *City of Galt v. Cohen* (2017) 12 Cal.App.5th 367, 384-385.) Thus, suggesting ill will or incompetence on the part of the Department for changing its mind does not help assess the legality of the ROPS denials now at issue. (Cf. *Hannon v. Madden* (1931) 214 Cal. 251, 268 [official acts presumed done in good faith, "even though mistakenly performed"]; *City of Emeryville v. Cohen* (2015) 233 Cal.App.4th 293, 302-303 [law presumes officials act in good faith]; Evid. Code, § 664.)

1

of the Plan." (Maj. opn., *ante*, at p. 13.) The Authority would pay Related up to $4.8 million. (*Id*. at pp. 13-14.) Some of this *might* include money from the RDA's Low and Moderate Income Housing Fund (i.e., housing set-aside funds), which included tax increment revenue that was statutorily designated (under the former Community Redevelopment Law (CRL), later abolished by the Great Dissolution) for use to improve the supply of affordable housing. (*Id*. at p. 13.) The City and its RDA were specified third party beneficiaries "with full right, but no obligation, to enforce the terms hereof." (*Id*. at p. 14.) Thus, they could compel compliance therewith, *but not themselves be compelled to do anything*. Thus, at that point there was no promise that any RDA money would be used for the revitalization project.

Effective June 28, 2010, the Housing Authority, the City, and the RDA entered into a "cooperation agreement" (also dated for identification purposes June 1, 2010) to fund the revitalization agreement. (Maj. opn., *ante*, at p. 14.) This cooperation agreement (funding agreement) described funding for the revitalization project and also referenced the RDA's statutory obligation under the CRL regarding affordable housing. The funding agreement recited that both the City and the RDA would transfer money to the Housing Authority for its use to implement the revitalization agreement, with the RDA's money to be used consistent with the CRL. (*Id*. at p. 14.) The maximum amounts the City would transfer ($3.759 million) and the RDA would transfer ($1.041 million) to the Housing Authority equaled the maximum the Housing Authority would have to pay Related for the revitalization agreement (i.e., up to $4.8 million). (See *id*. at pp. 14-15 & fn. 11.) However, the funding agreement did not specifically mention Related.

Effective January 31, 2011 (i.e., during the "fire sale" period after the Great Dissolution was announced but not yet adopted, see *City of Grass Valley v. Cohen* (2017) 17 Cal.App.5th 567, 574-575 & fn. 2 (*Grass Valley*)), the Housing Authority and the RDA entered into an "additional funding" agreement (second funding agreement). (Maj.

2

opn., *ante*, at p. 15.) It, too, references the RDA's duties under the former CRL regarding affordable housing. This second funding agreement recited that the Housing Authority and the RDA wanted the RDA to provide more housing set-aside funds ($15 million more) to the Housing Authority towards the revitalization agreement. It provided that the RDA's obligation would be at the RDA's "option" from funds of the RDA "*legally available therefor*. The payment obligation . . . hereunder *does not constitute a pledge of any particular funds* and is and shall be subordinate to any pledge or other commitment of the [Housing] Agency made in connection with any [RDA] bonds, now or hereafter issued."[2] (Italics added.) (*Id*. at p. 15.)

On February 1, 2011, the Housing Authority and Related amended their revitalization agreement, partly to account for the additional $15 million now anticipated to be given by the RDA (thus getting rid of money before it was diverted via the Great Dissolution) to the Housing Authority under the second funding agreement. (Maj. opn., *ante*, at p. 16.) This amendment to the revitalization agreement also established a schedule for payments from the Housing Authority to Related, including accounting for some payments already made.

The California Department of Finance (Department) initially approved some relevant ROPS items, but later denied others after an administrative meet and confer process in part because the former RDA was not a party to the revitalization agreement, a point the Department reiterated in a later ROPS decision, after this action began. (Maj. opn., *ante*, pp. 15-18.)

---

**2** I note the original funding agreement was signed three times by Elisa Stipkovich, in her capacities as executive director of the RDA, and of the Housing Authority, and of the City's Community Development Department, and the second funding agreement was signed twice by Stipkovich, as executive director of both the RDA and of the Housing Authority.

## DISCUSSION

"This case arises, as have many, from what we have previously characterized as the 'Great Dissolution' of California redevelopment agencies. [Citation.]" (*City of Azusa v. Cohen* (2015) 238 Cal.App.4th 619, 622-623 (*Azusa*).) Several observations flow therefrom.

*First*, it is important to keep in mind that the City (as itself), the City (as successor to its former RDA), and the Housing Authority, are each governed by the members of the City Council. This is reflected by the multiple signatures of the same official on relevant agreements in this record. (See fn. 2, *ante*.)

This circumstance is not unusual in RDA cases, and in fact partly *inspired* the Great Dissolution, as we have pointed out in other cases. (See, e.g., *Azusa*, *supra*, 238 Cal.App.4th at p. 624 ["The City, the Utility, and the RDA were governed by the same five elected city council members, and at oral argument on the petition the trial court referenced the 'three different hats' worn. Our Supreme Court has noted that 'the Legislature could well recognize that because of the conjoined nature of the governing boards of redevelopment agencies and their community sponsors, [obligations between them] often were not the product of arm's-length transactions.' [Citation.] The City is the successor agency to the RDA, bestowing yet another 'hat' on city council members"].) The significance of this is that, after the announcement of the Great Dissolution, these agencies were unlikely to have been acting at arm's length with each other.[3]

---

[3] The Governor's January 2011 announcement of the plan to abolish RDAs led to a "frenzy on the part of former [RDAs] and their sponsoring agencies throughout the state to lock up unencumbered tax increment." (*City of Tracy v. Cohen* (2016) 3 Cal.App.5th 852, 858; see *Brentwood*, *supra,* 237 Cal.App.4th at p. 499, fn. 14 [referring to the ensuing "rush" to create "transactions that were not at arm's length"].)

4

*Second*, as just suggested, the timing of relevant actions is critical. What happened after the announcement of the Great Dissolution must be viewed with healthy skepticism, as that is a period identified by the Legislature as one prone to abuse.

"As described by our high court . . . Assembly Bill No. 1X 26 consisted of two principal components, codified in two new parts of the Health and Safety Code. Part 1.8 was the 'freeze' provision, effective immediately upon gubernatorial signature on June 28, 2011, and Part 1.85 was the 'dissolution component.' The latter did not become operative until [the lifting of a judicial stay and a judicially reformed] date [of] February 1, 2012. [Citation.]" (*Grass Valley*, *supra*, 17 Cal.App.5th at pp. 573-574.) Later, "Assembly Bill No. 1484 . . . clarified the process of winding down the former RDAs. [Citations.] [*Grass Valley* involved] what the parties loosely refer to as 'clawbacks.' (See [Health & Saf. Code] §§ 34179.5, subds. (b) & (c), 34179.6, subds. (c) & (d).) This refers to the administrative unwinding (via the [Due Diligence Review]) of specified RDA transactions that occurred after the Great Dissolution was proposed in January 2011. The period subject to clawbacks is from January 1, 2011, to June 30, 2012. It includes but is not limited to the approximate six-month period referred to by the parties and described in the legislative history as the 'fire sale' of RDA assets, which lasted until the freeze took effect in June 2011. [Citation.]" (*Id*. at p. 574.)

As relevant to this case, changes to the funding and revitalization agreements-- resulting in formation of the second funding agreement, increasing by more than three times the amount of money potentially to be transferred from the RDA to the Authority, and the amended revitalization agreement--were made *after* the Great Dissolution was announced, i.e., during the so-called "fire-sale" or "clawback" period. What happened in this case appears to be a by-now typical scramble to evade the intended effects of that sea change in the law. (See fn. 3, *ante*.)

*Third*, this court has repeatedly rejected claims that the Great Dissolution impaired any contracts. (See, e.g., *Grass Valley*, *supra*, 17 Cal.App.5th at pp. 591-593; *Cuenca v.*

5

*Cohen* (2017) 8 Cal.App.5th 200, 227-230; *City of San Jose v. Sharma* (2016) 5 Cal.App.5th 123, 139-141; *City of Petaluma v. Cohen* (2015) 238 Cal.App.4th 1430, 1442; *Brentwood*, *supra*, 237 Cal.App.4th at pp. 503-504; *California Redevelopment Assn. v. Matosantos* (2013) 212 Cal.App.4th 1457, 1492-1494; see also *Azusa*, *supra*, 238 Cal.App.4th at pp. 630-631.)**[4]**

Although the majority discusses and factually distinguishes one such case (*Galt*), it does not acknowledge the many others. In my view, there is now a settled general rule *against* finding an impairment of contracts such that a clear factual or procedural difference must be identified to justify a different result in a given case. For the reasons that follow, I am no longer persuaded that *this* case presents any material differences that justify refusing to apply the general rule--promulgated by this court--that application of the Great Dissolution does not impair contracts.

The majority holds that the fact that a private entity (Related) is a real party in interest makes a material difference. (Maj. opn., *ante*, at pp. 31-32.) I might agree only if the RDA as a source of contractual payment had been a bargained-for term of Related's contract, which is not the case. The majority states the question "is whether the invalidation of the [RDA's] promise to provide funds to the [Housing Authority], so that the [Housing Authority] could provide them to Related, unconstitutionally impaired Related's contractual rights." (*Id*. at p. 29.) But the RDA *never made such any promise* to Related. Nor is Related left without a remedy, as it still has a contract with the

---

**[4]** Both parties asked the trial court to judicially notice trial court decisions in other RDA cases, and the trial court granted the requests, but properly declined to treat the decisions as precedential. It should have denied the requests. (See *County of San Bernardino v. Cohen* (2015) 242 Cal.App.4th 803, 816 ["these [trial court RDA decisions] are not even citable under the Rules of Court (Cal. Rules of Court, rule 8.1115), and they bear no precedential weight"] (*San Bernardino*).)

Housing Authority.[5]  All Related lost was the possibility that the former RDA would contribute money towards the contract.  Nothing obligated the former RDA to do so.  Absent a legal obligation on the part of the RDA to pay anything toward the Related contract, I do not see how the effective defunding of the RDA (regarding this transaction) impaired Related's enforceable contractual interests.[6]

I agree with the majority that the key dissolution statute is Health and Safety Code, section 34171, subdivision (d)(2),[7] which excludes from the definition of an

[5] Related and the Housing Authority, which might otherwise be suing each other, are here represented by the same counsel.  I express no view on the propriety of this fact.  But the City's view that the Housing Authority has no other funds with which to pay Related raises factual issues not amenable to resolution on appeal in this administrative mandamus case, particularly since the Housing Authority is an arm of the City.

[6] I agree, as this court has held several times, that impairing *security* can in some circumstances impair contract rights, i.e., even without a present contractual default.  (See, e.g., *Teacher's Retirement Bd. v. Genest* (2007) 154 Cal.App.4th 1012, 1029-1033; *Board of Administration v. Wilson* (1997) 52 Cal.App.4th 1109, 1137; *Valdes v. Cory* (1983) 139 Cal.App.3d 773, 785-791.)  But absent a promise by the RDA to Related, Related's expectations of payment flowing from the RDA were just that:  expectations or hopes, not an enforceable right.

I also note that the Department argues the references in the contracts to the CRL manifested an intention that the contracts be governed by any changes thereto.  (See *City of Torrance v. Workers' Comp. Appeals Bd.* (1982) 32 Cal.3d 371, 379 [rejecting contract clause claim; " '[When] an instrument provides that it shall be enforced according either to the law generally or to the terms of a particular . . . statute, the provision must be interpreted as meaning the law or the statute in the form in which it exists at the time of such enforcement' "]; *id.*, p. 380 ["The City had every reason to anticipate that its rights under those agreements would change over time"]; cf. *California Redevelopment Assn. v. Matosantos, supra,* 212 Cal.App.4th at p. 1494 ["there is no showing . . . that any change in the law . . . has or will substantially impair any contractual obligation that has been assumed by the successor agencies"].)  The City replies that nobody could have predicted the Great Dissolution, which is relevant--if at all--only as to the *original* revitalization and funding agreements.  But I need not resolve that point here.

[7] Further statutory references are to the Health and Safety Code.

7

"enforceable obligation" most contracts between a city and its former RDA. (See maj. opn., *ante,* at pp. 27-29.) The trial court correctly found that the funding agreement was between the former RDA, the City, and the Housing Authority, an entity that the trial court found and the parties agree, is treated by statute (§ 34167.10, subd. (a)) as an arm of the City. Without more, there would be no colorable claim that Related could somehow enforce that agreement.

I also agree with the majority's observation that Related's primary argument is that the statute (§ 34171, subd. (d)(2)) should not be interpreted so as to invalidate an agreement involving a private party's contract rights. (Maj. opn., *ante,* at p. 27.) As the majority aptly explains, "The problem with plaintiffs' argument is that they have attempted to frame it as an issue of statutory interpretation, when what they are really raising is an 'as applied' constitutional challenge to the statute." (*Id.* at p. 27.) But the majority goes on to say that this challenge hinges on "the facts presented by this case." (*Id.* at p. 28.) I do not agree. While an as-applied challenge may result in a tort suit for damages due to an alleged impairment of contracts, or perhaps for an unconstitutional government taking, this is an administrative mandamus petition seeking to overturn specific ROPS decisions by the Department. It is not a suit for damages for a taking, a breach of contract, or an impairment of contract. Related (and the public entities represented by the same counsel) alleged in their petition that the contracts would not have been made without assurance of RDA funding (i.e., detrimental reliance on promised RDA funding), and alleged the various contracts should be read as one (i.e., Related must be deemed a third party beneficiary in agreements to which it is not explicitly a party). But they did not include in their petition an action for damages for an impairment of contract by the Department, as the majority implies.

We have previously pointed out that "[o]n the face of section 34171(d)(2), there is no exception for an agreement between a former [RDA] and its creator if there is another party to the contract." (*San Bernardino, supra*, 242 Cal.App.4th at p. 816.) The majority

8

does not explain away this observation. And in any event, the trial court plausibly explained why the revitalization and funding agreements--both later amended--were not "integrated," that is, could not be treated as one over-arching contract. This is so, the trial court found, because although the revitalization agreement anticipated the funding agreement's existence, the funding agreement did not *require* the RDA to pay anything. Further, the trial court aptly noted that the revitalization agreement specified that the City and its RDA were third party beneficiaries, showing the parties understood the significance of such status, but the funding agreement did *not* make Related a third party beneficiary. Nor did the revitalization agreement include the funding agreement as one of the various documents deemed integrated with it. The funding agreement cannot be enforced by Related, because Related was neither a named party nor third party beneficiary, and it had no rights thereunder.

The trial court's conclusion seems correct, and indeed, the majority does not directly dispute it. Instead, the majority holds that it is immaterial whether or not the agreements should be treated as integrated, because they are "interdependent." (Maj. opn., *ante,* at pp. 28-29.) No authority is provided for this proposition, nor do I understand how "interdependent" means anything other than integrated in this context.

If there are two distinct contracts, which the trial court found and the majority does not contest, each should be examined in light of the Great Dissolution. If one (the funding agreement) does not create any enforceable obligation because it was made between the former RDA and the City (and the City-controlled Housing Authority) (see § 34171, subd. (d)(2)), Related's remedy, if any, should be limited to the only contract to which it is a party, that is, the revitalization agreement between Related and the Housing Authority. If Related has performed services under that contract for which it has not been paid, perhaps it has a contract claim against the Housing Authority. But that does not mean it can preclude the administrative unwinding of the funding agreement, as to which it is neither a party nor a third party beneficiary.

9

But the majority concludes that because the Department disallowed payments (or proposed payments) by the former RDA that were destined for the Housing Authority under the funding agreements but never promised to Related, the Department has thereby unconstitutionally impaired Related's revitalization agreement with the Housing Authority.  (Maj. opn., *ante*, at pp. 31-35.)  I cannot endorse this view.

Accordingly, I concur in Part III of the opinion but respectfully dissent from Parts II and Part IV (to the extent it endorses Part II), and concur in the result in Part I.


/s/
Durate, J.

10